

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ENTERED**
**02/04/2013**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 11-38053** |
| **HDD ROTARY SALES, LLC** | § | **CHAPTER  11** |
| | § | |
| Debtor(s). | § | **JUDGE ISGUR** |
| | § | |
| | § | |
| **TIGER TRADING, INC.** | § | |
| | § | |
| Plaintiff(s), | § | |
| | § | |
| vs. | § | **ADVERSARY NO. 11-03566** |
| | § | |
| **HDD ROTARY SALES, LLC,** *et al* | § | |
| | § | |
| Defendant(s). | § | |

## <u>MEMORANDUM OPINION</u>

Robert Ogle's Rule 7052(c) Motion for Judgment on Partial Findings is granted.

To the extent that Tiger Trading's brief, (ECF No. 93), constitutes a Rule 9023 Motion

for Reconsideration and Rule 7015(b) Motion to Amend, those motions are denied.

## <u>Background</u>

HDD Rotary Sales, LLC filed a voluntary Chapter 11 bankruptcy petition on September

23, 2011.  (Case No. 11-38053, ECF No. 1).

Tiger Trading filed this adversary proceeding on November 4, 2011.  (ECF No. 1).  Tiger

Trading seeks a declaratory judgment that it owns 30% of an invention known as PTech+.  (ECF

No. 10).[1]   Rights in PTech+ comprised a significant portion of HDD's assets when it filed

bankruptcy.

---

[1] At other times the technology has had different names, such as MxT.  The Court will refer to the technology only
as PTech+ in order to avoid confusion.

In HDD's bankruptcy case, Tiger Trading filed a motion for adequate protection to protect its asserted rights in PTech+.  (Case No. 11-38053, ECF No. 57).  On November 21, 2011, Tiger Trading and HDD Rotary entered into an agreement, incorporated into an order issued by the Court, concerning the motion for adequate protection.  (Case No. 11-38053, ECF No. 158).  The terms of the agreed order allowed plan confirmation (and the sale of all of HDD Rotary's assets, including PTech+) to go forward, but delayed distribution of the sale proceeds until final adjudication of this adversary proceeding.

This adversary proceeding determines the rights of the parties and the division of the sale proceeds.  Tiger Trading's ownership rights in PTech+, if any, attached to the sale proceeds pursuant to the agreed order.

If Tiger Trading does not have a 30% ownership interest in PTech+, Tiger Trading may have an unsecured claim against the estate, but any such claim is beyond the scope of this opinion.

On December 22, 2011, the Court confirmed HDD Rotary's Chapter 11 plan.  (Case No. 11-38053, ECF No. 235).  HDD's assets were sold to Redneck Pipe Rentals, Inc.  (Case No. 11-38053, ECF No. 235 at 13).

The confirmed plan provided for a Plan Agent to implement the plan.  (Case No. 11-38053; ECF No. 160 at 5).  Examples of the Plan Agent's powers and responsibilities include the ability to prosecute avoidance actions and claim objections.  (Case No. 11-38053, ECF No. 160 at 55-56).  Robert Ogle is the Plan Agent.

On March 30, 2012, Ogle filed his original answer and counterclaim in this adversary proceeding.  (ECF No. 48).

Ogle filed a Motion for Summary Judgment on July 29, 2012.  (ECF No. 62).  The Court denied this Motion on September 11, 2012.  (ECF No. 67).

The trial was bifurcated.  (ECF No. 45).  The initial stage addressed only ownership of PTech+. (ECF No. 45 at 1).  The first stage of the trial began on September 21, 2012, and was continued until October 16, 2012, when it was completed.  After Tiger Trading rested its case-in-chief, Ogle moved for judgment on partial findings.  The Court preliminarily granted the motion but allowed Tiger Trading an opportunity to file a brief in response.

Tiger Trading filed its brief on October 30, 2012.  (ECF No. 93).  Ogle responded on November 6, 2012.  (ECF No. 95).

This Memorandum Opinion: (i) provides findings of fact and conclusions of law as required by the Federal Rules of Bankruptcy Procedure; (ii) explains the reasons for granting Ogle's motion for judgment on partial findings; and, (iii) explains the reasons for denying Tiger Trading's Rule 9023 and 7015(b) motions.

## Analysis

### I.    The Parties' Assertions

The initial stage of trial focused solely on ownership of PTech+.  The parties' joint pretrial statement provided a concise statement of the case:

> Tiger Trading, Inc. ("Tiger") brought this Adversary Proceeding against HDD Rotary Sales, LLC ("HDD" or, now, the "Plan Agent") for a declaratory judgment that it owns 30% of PTech+, a technology and patent-pending that was sold pursuant to the confirmed Plan of Reorganization in the underlying bankruptcy case.  Tiger also seeks an award of the sale proceeds from the sale of the Debtor in an amount equal to 30% of the sale price attributable to PTech+.  The Court has bifurcated this case into two separate trials; the first to determine whether Tiger owns any interest in PTech+, and the second to determine what portion of the sale price of the Debtor was attributable to PTech+.

> Tiger asserts that it was the owner of 30% of PTech+ from its creation and/or inception through its sale pursuant to the confirmed Plan. The Plan Agent denies that Tiger has any ownership interest in PTech+.

(ECF No. 65 at 1).

Tiger Trading contends that it has a 30% ownership interest in PTech+ due to an agreement reached amongst the parties (and later modified) to invent and develop the PTech+ technology:

> Tiger contends that Tiger, Gary Haub (either individually or by and through one of his companies), and Cain Pacheco (collectively the "Parties") agreed, prior to its inception, to invent and develop the technology that is known today as PTech+. The Parties further agreed that the ownership breakdown would be 60% for Haub (or subsequently, HDD), 30% for Tiger, and 10% for Cain Pacheco (the inventor). Tiger further contends that the value of HDD at its time of sale was almost entirely attributable to PTech+, and that Tiger is thus entitled to 30% of the sale proceeds, as they were never part of the Debtor's estate.

(ECF No. 65 at 2). Ogle disagrees:

> The Plan agent contends that there never was an agreement to jointly develop PTech+ and, in the alternative, that if there was such an agreement then there is a failure of consideration on the part of the Plaintiff forgiving Defendant of its duty to perform. Additionally, if the Court finds that Tiger is a 30% owner of PTech+, the Plan Agent is seeking contribution from Tiger for Tiger's share of the development of PTech+.

(ECF No. 65 at 2).

## II.   Motion for Judgment on Partial Findings

Bankruptcy Rule 7052 makes Rule 52 of the Federal Rules of Civil Procedure applicable to adversary proceedings. FED. R. BANKR. P. 7052. At the close of Tiger Trading's case-in-chief, Ogle moved for judgment on partial findings. The text of that rule reads:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter a judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the

evidence.   A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

FED. R. CIV. P. 52(c).  Rule 52(a) reads:

> In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.

FED. R. CIV. P. 52(a)(1).  Unlike a motion for summary judgment, the nonmovant is not entitled to favorable factual inferences.  *See Williams v. Mueller*, 13 F.3d 1214 (8th Cir. 1994).

### III.   Findings of Fact

The Court makes the following findings of fact as to the veracity of the witnesses and as to the events surrounding PTech+.[2]

#### a.   Veracity of Witnesses

Thorn Huffman (Tiger Trading's President) and Linda Freels (a Tiger Trading employee) testified in Tiger Trading's case-in-chief.  In addition, Robert Graham's video deposition was played in court.

The Court found these witnesses credible and believes that they testified truthfully.  This is not to say that their testimony was always 100% accurate, as discrepancies are inevitable.  The Court does not believe, however, that any of these witnesses lied to or intentionally misled the Court.

#### b.   Findings of Fact Related to PTech+

Tiger Trading was founded 2003 and is in the business of selling drilling tubulars.  (ECF No. 85 at 17).  Thorn Huffman is Tiger Trading's president.  (ECF No. 85 at 21).  Huffman has

---

[2] Not all of these facts are in dispute.

previous experience in the industry dating back to around 1969.  (ECF No. 85 at 17).  Tiger Trading is the entity through which Huffman conducts his business.[3]

Gary Haub is an acquaintance and business associate of Huffman.  Huffman met Haub in 2001 while Haub was working at Drill Tube International, a subsidiary of Grant Prideco.  (ECF No. 85 at 26).  Haub owns interests in, or has owned interests in, numerous business entities, including Sooner Sales, HDD Rotary, and G&R Pipe Sales.

Cain Pacheco is an engineer and the inventor of PTech+.  Huffman met Pacheco in 1999. (ECF No. 85 at 26).

Huffman routinely conducts business on the basis of a handshake.  (ECF No. 85 at 18). This is common practice in Huffman's industry.  (ECF No. 85 at 18-19). Haub and Huffman previously conducted deals on the basis of a handshake.  (ECF No. 85 at 37).  Haub and Huffman shared office space from approximately June 2007 until June 2011.

PTech+ is a high torque premium connection used in drilling tubulars.  (ECF No. 85 at 18).  PTech+ has a special design that allows it to be used in long lateral wells.  (ECF No. 85 at 20).

In November of 2006, Haub proposed to Huffman the idea of hiring Pacheco to work for both of their respective businesses.  (ECF No. 85 at 27).  Haub and Huffman agreed to split Pacheco's compensation and expenses.  (ECF No. 85 at 27, 29).  Pacheco was then working for Grant Prideco and finishing his final semester at the University of Houston.  (ECF No. 85 at 28-29).  Upon his departure, Grant Prideco required Pacheco to reimburse Grant Prideco for tuition

---

[3] The Court may at times refer to Tiger Trading or to Huffman, the individual.  References to actions of Tiger Trading should be considered actions of Huffman via the entity Tiger Trading.  A reference to either should be considered a reference to the plaintiff.

advanced on his behalf.  (ECF No. 85 at 30).  Tiger Trading covered this expense of approximately $8,500.  (ECF No. 85 at 30).

Pacheco started working for Haub and Huffman in mid-May 2007.  (ECF No. 85 at 31). Pacheco's work for Tiger Trading was primarily doing engineering drawings for tool joints, working as a salesman, and providing engineering support.  (ECF No. 85 at 31).  At the beginning, Tiger Trading paid Pacheco's entire salary and then billed one of Haub's companies (Sooner Sales) for the rest. (ECF No. 85 at 31).  There was no formal delineation of when Pacheco would work for Huffman and when he would work for Haub.  (ECF No. 85 at 30-31).

This arrangement changed on June 21, 2007.  Haub, Pacheco, and Huffman had a meeting at Lake Conroe, Texas. (ECF No. 85 at 33).  The parties discussed Pacheco's idea for a new premium high-torque connection.  (ECF No. 85 at 33).  Haub asked Huffman if he was interested in being involved, and Huffman responded affirmatively. (ECF No. 85 at 33).  Haub's statement to Huffman was approximately: "Are you interested in getting involved with this?" (ECF No. 85 at 59).  What the word "this" actually referenced was not explicitly defined, although the parties had been discussing Pacheco's idea for an invention that would become PTech+. The parties did not discuss their respective rights and duties under this agreement.

Huffman's understanding of the agreement on June 21, 2007, was that he and Haub would continue to split Pacheco's salary (the "lion's share" of the development costs) and would own the rights to any invention evenly.  (ECF No. 85 at 36) ("[W]e would continue to split Cain's salary and payroll expenses on a 50-50 basis as we'd been doing, and we would allow time out of both of our schedules with Cain to develop this technology, and we would be 50-50 in the ownership of the technology.").  Many specifics of the deal were not discussed, as was typical of deals between Huffman and Haub.  (ECF No. 85 at 70).

A written agreement was not executed on June 21, 2007.  (ECF No. 85 at 37).  Although the parties discussed executing a written agreement on numerous occasions, it was never done.  (ECF No. 85 at 72).

Two days after the initial agreement, on June 23, 2007, Haub and Huffman met to discuss a separate project.  (ECF No. 85 at 37-38).  At the meeting, Haub told Huffman that he believed he was entitled to a 2/3 – 1/3 split, and Huffman agreed.  (ECF No. 85 at 38) ("[H]e thought that he – it should be two-thirds/one-third instead of 50-50 because he brought Cain to the table and he brought the idea to the table. And I said, You know, I think that's fair, I mean I don't have a problem with that.").  Pacheco's salary, however, would continue to be split evenly.  (ECF No. 85 at 38).[4]

On July 23, 2007, during a flight to China with Huffman on a Tiger Trading business trip, Pacheco had a breakthrough with the PTech+ design.  (ECF No. 85 at 41-42).

Tiger Trading continued to pay Pacheco's salary up front and bill Sooner Sales until March 2008.  (ECF No. 85 at 42). At that point, G&R Pipe Sales[5] paid Pacheco's salary and then billed Huffman/Tiger Trading.  (ECF No. 85 at 42).  HDD Rotary took over the payments from G&R Pipe Sales after HDD Rotary was formed.

After the initial meeting on June 21, 2007, the parties discussed their plans for PTech+ on numerous occasions.  The parties discussed topics such as how best to market PTech+, whether PTech+ needed to be moved into a separate entity, and the need to put their agreement in writing.  (ECF No. 85 at 116-17, 129).  At no point, however, did the parties (either orally or in writing) discuss in detail all aspects of the agreement.

---

[4] This was not explicitly discussed.  This was Huffman's understanding of how Pacheco's salary would be split. Thereafter, Tiger Trading and HDD continued to split Pacheco's salary.

[5] G&R Pipe Sales was a stainless steel trading business owned by Gary Haub and Rex Inman.  (ECF No. 85 at 42).

The first sale of PTech+ was to Brigham Oil and Gas in June 2009.  Around this same time, Huffman and Haub again revised the split.  (ECF No. 85 at 49-50).  Haub suggested to Huffman that they "bring in Cain [Pacheco] for 10 percent."  (ECF No. 85 at 50).  Huffman agreed.  (ECF No. 85 at 50).  The split then became 60% for Haub, 30% for Huffman, and 10% for Pacheco.  (ECF No. 85 at 50).

PTech+'s patent application was filed in July 2009.  (ECF No. 85 at 56).  It remains pending.  On July 14, 2009, Pacheco signed a document entitled "Employee's Assignment Of Invention to Employer," which purported to assign all of Pacheco's rights in PTech+ to HDD Rotary Sales LLC.  (Pl. Ex. 1).  From this point forward, 100% of the rights to PTech+ were with HDD Rotary.

Huffman viewed HDD Rotary as a nominee of sorts, a technical owner of the patent. (ECF No. 85 at 82) ("We were putting everything into HDD, a lot of the marketing effort was HDD, I didn't generate separate marketing materials in Tiger Trading, I used HDD's, we worked together closely.  My goal was to get this patent filed because I was concerned that it had languished and I didn't want to have a problem on dates.  So I was happy to get it done, and we'd sort it all later just like everything else."); (ECF No. 85 at 87) ("HDD in my mind was like a nominee.  They had 100 percent of it because that was the most convenient way to get to where we were at that point. Because we had not spun this out like we – like the plan was, so why not put it all in one place, we spin it out later.").

Tiger Trading continued to pay, directly or indirectly, half of Pacheco's salary through October of 2009.  (ECF No. 85 at 44).

Tiger Trading did business with HDD Rotary unrelated to PTech+.  Through this unrelated business, HDD Rotary wound up owing a substantial amount of money to Tiger

Trading.  (ECF No. 85 at 48-49) ("I funded a lot of HDD because I had open accounts receivable for tool joint sales primarily that they used for other customers, and when the customers paid them, they didn't pay me.  So they used that money elsewhere . . . .").

In the fall of 2009, after the assignment to HDD Rotary, Huffman and Haub planned to bring Huffman in as a member of HDD Rotary (an LLC).  (ECF No. 85 at 82).  Excepting PTech+, HDD Rotary's liabilities exceeded its assets in the fall of 2009.  (ECF No. 85 at 125-26, 147).  Huffman was aware of this fact at the time of these negotiations.[6]

The terms of the membership agreement were as follows.  Huffman would become a member of and take a 30% ownership interest in HDD Rotary.  (ECF No. 85 at 125; Pl. Ex. 7).  Huffman would also receive $200,000.00 of the $500,000.00 owed to him, paid out of loan proceeds given to HDD Rotary.  (Pl. Ex. 7).  In exchange, Huffman would convert the remaining $300,000.00 owed to him into a three-year note and agreed to sign as guarantor on several loans.  (ECF No. 85 at 89; Pl. Ex. 7).

Huffman completed the membership documents.  (ECF No. 85 at 89).  Huffman signed as guarantor for the loans and converted the $300,000.00 into a three-year note.  (ECF No. 85 at 88-89).  Although HDD Rotary received the loan proceeds, Huffman was not paid the $200,000.00 agreed upon.  HDD Rotary's failure to perform led Huffman to call off the agreement and resign as an employee and member of HDD Rotary, effective February 12, 2010.  (ECF No. 85 at 94, 131) ("HDD never performed on its end of the deal and so I rescinded the deal and everybody was put back where they were.  With the exception of I left the long-term

---

[6] Huffman at one point stated that HDD Rotary misrepresented its financial condition to Huffman and that, were it not for this misrepresentation, Huffman would not have agreed to become a member.  (ECF No. 85 at 94).  Although HDD Rotary might have made these misrepresentations, Huffman's later testimony indicates that he was aware that HDD Rotary had more liabilities than assets.  (ECF No. 85 at 125-26, 147).

note in place and could not get off the bank guarantees."); (Def. Ex. 8). Huffman remained as a guarantor on the loans and left the $300,000.00 note in place. (ECF No. 85 at 91).

In late 2009, after the first sale of PTech+ to Brigham, Grant Prideco filed a trademark and patent infringement lawsuit against HDD Rotary. (ECF No. 1 at 6). Tiger Trading and Huffman were not named as defendants. (ECF No. 85 at 120). During the patent litigation period, customers (with the apparent exception of Brigham) did not wish to purchase PTech+. (ECF No. 85 at 123). Huffman was heavily involved with the litigation. (ECF No. 85 at 118). When a settlement was reached around August 2010, the agreement was only signed by HDD Rotary. (ECF No. 85 at 120). Huffman was not a member of HDD Rotary at that point.

In early 2011, discussions were had regarding the sale of HDD Rotary (and PTech+) to Axon Products. (ECF No. 85 at 136). On July 21, 2011, Huffman put forth two different proposals to Axon Products regarding a buyout of Tiger Trading's asserted interest in PTech+. (Pl. Ex. 2). Axon Products did not respond. (ECF No. 85 at 137). Huffman then contacted Axon's CFO by email on August 22, 2011. (Pl. Ex. 24). Finally, on September 19, 2011, Huffman's attorney sent a letter to Axon advising them that PTech+ could not be sold without Tiger Trading's consent. (Pl. Ex. 4).

HDD Rotary filed for bankruptcy four days later.

## IV.    Conclusions of Law[7]

The parties agreed in their joint pretrial statement that for the oral agreement to be enforceable, "the court must find that the oral agreement is sufficiently definite in its terms that a court can understand what the respective promises were." (ECF No. 65 at 3).

---

[7] Any part of this section which may be construed as a finding of fact should be considered as an additional finding of fact by the Court.

This is a correct statement of the law.  *See T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook. The material terms of the contract must be agreed upon before a court can enforce the contract.  Where an essential term is open for future negotiation, there is no binding contract.") (internal citations omitted); *see also Knowles v. Wright*, 288 S.W.3d 136 (Tex. Ct. App.—Houston 2009) ("It is well established that the terms of an oral contract must be clear, certain, and definite.") (quoting *Gannon v. Baker*, 830 S.W.2d 706, 709 (Tex. Ct. App.—Houston 1992)).

The Court concludes that Tiger Trading's case-in-chief failed to demonstrate the existence of an enforceable oral contract.  This failure is dispositive and justified granting Ogle's motion for judgment on partial findings.

The ultimate result sought by Tiger Trading (30% ownership in PTech+) is clear.  The essential terms of the agreement entitling Tiger Trading to that result are not clear.  Tiger Trading failed to sufficiently explain the parties' respective rights and duties that constituted the agreement.  In addition, there are discrepancies as to the general structure of the agreement.

The sections below highlight the specific reasons for this conclusion.

### a. Discrepancies as to the General Structure of the Initial Agreement

There are discrepancies surrounding the general structure of the initial agreement.

Huffman testified that Haub's offer to him was something along the lines of "Do you want in on this?" or "Are you in?"  (ECF No. 85 at 60).  After Tiger Trading's case-in-chief, it is still unclear whether "this" referred to splitting ownership of PTech+, splitting ownership of a to-be-formed entity that would own PTech+, or both.

The joint pretrial statement stated that Tiger Trading contended the agreement was to codevelop and own the rights in PTech+ itself.   (ECF No. 65 at 2). The joint pretrial statement does not mention an agreement to form an entity that would own PTech+.   (ECF No. 65). Huffman's initial testimony also indicated that the initial agreement was about ownership rights in the invention itself.  (ECF No. 85 at 36) ("[My understanding was] we would continue to split Cain's salary and payroll expenses on a 50-50 basis as we'd been doing, and we would allow time out of both of our schedules with Cain to develop this technology, and we would be 50-50 *in the ownership of the technology*.") (emphasis added).

Huffman's later testimony appeared, at times, to alter the nature of the initial agreement. At times the agreement referenced was to split the ownership rights in a company that would own PTech+.  The following excerpt, in which both versions are referenced within a short span of time, is exemplary of this discrepancy:

> **Huffman**: Gary and my deal was that we would, you know, we would eventually form a new company, put this asset into it and sort out the expenses and revenue at that time.
>
> **Wyatt [Huffman's counsel]**: All right.  Now from and after July 14 of 2009, have you ever signed a document to convey away your interest in PTech?
>
> **Huffman**: No.
>
> **Wyatt**:  Your previous testimony indicated that you had agreed to split the technology 33 percent, 67 percent essentially one-third/two-thirds.  But you've actually asked the Court for a finding that you own 30 percent. Why?
>
> **Huffman**: Gary came to me—I want to digress. . . .

(ECF No. 85 at 49-50).

The original and amended complaints, however, appear to allege that two separate agreements (to split the ownership rights in the technology and to split the ownership of a company that would own the technology) were reached on June 21, 2007.  (ECF No. 10 at 4)

("At the same time [as the agreement to split ownership in the PTech+ invention], [Huffman, Haub] and Pacheco . . . agreed to establish a new entity that would patent, market, license, and supply PTech+.").   Huffman's trial testimony, on the other hand, indicates that the idea of putting PTech+ into a company and sharing the ownership of that company was an idea developed later on.  (ECF No. 85 at 69) ("[I didn't expect to be reimbursed for] a lot of time.  A lot of time.  And I spent a hell of a lot of time on Ptech and I was paralyzed because HDD had me with what they owed me, and I knew I had losses in Tiger Trading, or lost opportunities.  I didn't expect to get that back.  *That's one of the reasons I pushed to get it into a new company so that wouldn't occur in the future and Tiger would be effected [sic] the way it was.*") (emphasis added).   An email admitted into evidence at trial also indicates that the agreement to create an entity came later.  (Pl. Ex. 24) (email dates from 2011 and states that PTech+  should have been placed in a separate entity two years prior).

The fact that Tiger Trading's own case-in-chief contains these discrepancies undermines its argument that there was a meeting of the minds on June 21, 2007 as to what the parties were actually agreeing to do.

### b.  Essential Terms Missing

Essential terms of the agreement are missing.  The Court does not understand what the parties' respective rights, obligations, and duties were under the agreement.  "For an enforceable contract to exist, the legal obligations and liabilities of the parties must be sufficiently definite." *See Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 793 (Tex. Ct. App.—Dallas 2007) (citing *Searcy v. DDA, Inc.,* 201 S.W.3d 319, 322 (Tex. Ct. App.—Dallas 2006)).  Other than the ultimate result, the Court does not understand the agreement that it is being asked to enforce.

Huffman acknowledges that the parties failed to discuss many aspects of the agreement. Huffman repeatedly made statements such as "we would sort it out later."  When asked whether he and Haub discussed the specifics of the deal when the arrangement was made, Huffman responded:  "[W]e never went to this kind of detail that you're speaking of in any of our business arrangements.  We had a handshake, we had an understanding of how we were going to do it, but to go into these type details we never did, no." (ECF No. 85 at 70).   Although this may be true, Huffman needed to demonstrate that the parties had a meeting of the minds as to the essentials terms of the agreement in order for the agreement to be enforceable.  Huffman' case-in-chief failed to do so.

The Court will assume that when Haub asked Huffman "Do you want in on this?", and when Huffman responded affirmatively, that the parties had a meeting of the minds that Haub and Huffman would somehow share the PTech+ invention.  Whether it was to share the future invention, to create and share an entity that would own the invention, or both, this is only one aspect of the agreement—the end goal essentially.  This is the only thing that the parties definitely discussed on June 21, 2007.  As for all other essential aspects of the agreement, there is only Huffman's subjective understanding or nothing at all.

Huffman testified that his understanding of the agreement after the discussions on June 21, 2007 was that he and Haub would continue to split Pacheco's salary and would share the ownership of the new technology evenly.  (ECF No. 85 at 36).[8]  Huffman admitted that his understanding came from previous business deals with Haub.  (ECF No. 85 at 70).  Even if the Court accepted Huffman's understanding as evidence of a meeting of the minds as to those terms, many other essential terms remain missing.

---

[8] Again, the alterations to the ownership percentages came after June 21, 2007.

The Court does not understand what Huffman and Haub each promised to contribute to the project (other than, perhaps, splitting Pacheco's salary). For Pacheco it is clear—he was the inventor. Huffman put forth evidence of his contributions in the development of PTech+, such as his marketing efforts and his advancement of some development costs. (ECF No. 85 at 82). This was after the fact, however. Tiger Trading did not indicate that these were Huffman's agreed upon legal obligations at the time of the agreement. If Pacheco was to be the inventor, Tiger Trading needed to show what Haub and Huffman promised to contribute to the joint venture on June 21, 2007. The answer, as far as the Court can tell after Tiger Trading's case-in-chief, is nothing concrete.

The financing of development costs other than Pacheco's salary was not discussed on June 21, 2007. (ECF No. 85 at 36). This necessary aspect of an agreement to invent wasn't discussed until a year or two later. (ECF No. 85 at 61).

The accounting for the sharing of the invention was not sufficiently discussed at any point in time. For example, how much of Pacheco's salary would constitute an expense attributable to PTech+ (and thus subtracted out of revenues) was not discussed. (ECF No. 85 at 102). How to address the time Huffman and Haub spent on PTech+ related matters was not addressed.

These are material issues. As set forth above, the parties had agreed to share Pacheco's salary 50/50. This arrangement continued even after the 60/30/10 split was discussed. When PTech+ had sales, was the 60/30/10 profit split to be calculated before or after deducting Pacheco's salary? And would all of his salary be deducted? The parties did not keep track of how much of Pacheco's time was spent on which project. Without those records, how could the profits be apportioned accurately?

Given a hypothetical scenario of a final accounting for PTech+ (expenses, profits, etc.), Huffman was unable to clearly explain how the amounts would be broken down and who would receive what.  (ECF No. 85 at 99-104).  Huffman only had assumptions, based on analogies to other deals with Haub, as to how this accounting might have worked:

> It is a complicated deal.  There's no question.  I mean – as brought out a lot, it wasn't put into writing.  I mean just like our drill collar deal, it was 50-50, but the cost structure was all over the place.  So we balanced that out, Tiger paid for all that.  This would have probably been handled very similarly if it came to an end just like the drill collars did.

(ECF No. 85 at 104).  It should be noted that Tiger Trading did not provide funds for patent attorneys, rent, and certain other costs associated with the development of PTech+.  Were these costs recoverable before a 60/30/10 split?  Were they to be amortized over the life of the patent?  The Court has no answers to any of these questions.

Although the parties' respective rights and obligations are essential terms of any contract, the type and purpose of the contract determines whether or not other terms are essential.  *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("Each contract should be considered separately to determine its material terms. In a contract to loan money, the material terms will generally be: the amount to be loaned, maturity date of the loan, the interest rate, and the repayment terms.") (internal citations omitted).

The Court recognizes that minor economic terms could be imposed on the parties.  However, the breadth of the missing terms in this case leaves the Court with little latitude to do so.  Nevertheless, the economic terms are not even the most important missing element.

The parties did not discuss, when the agreement was initially made or at any point thereafter, their rights and duties with respect to co-ownership of the technology.  (ECF No. 85 at 64).  (ECF No. 85 at 67, 149-50).   In other words, the parties did not discuss what rights their respective ownership interests in the invention actually afforded them.

Tiger Trading at various times alleges that it was to be a direct co-owner of PTech+ and at other times alleges that PTech+ was to be owned by a to-be-formed entity. As correctly explained by Tiger Trading, each direct co-owner of a patent may independently exploit the patent:

> In the absence of any agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention within the United States, or import the patented invention into the United States, without the consent of and without accounting to the other owners.

35 U.S.C. § 262. Under the direct co-owner scenario, Tiger Trading (purportedly a 30% co-owner) could have licensed the technology to a third party or could have manufactured the product as a co-owner of the patent. And, it could have done so without Haub's or Pacheco's permission.

However, if the patent was to be owned by an entity, then only the entity would have had the right to exploit the patent. Presumably, Tiger Trading would have owned 30% of the entity and been unable to issue a license or sell the product without Haub's or Pacheco's consent. Would the entity's governance documents nevertheless have given Tiger Trading any rights of control? These are unanswered questions that leave the fundamental ownership rights in PTech+ wholly unresolved.

If the initial agreement was to create an entity to own PTech+, there is no evidence that the parties agreed upon the type of entity they would form. The respective choice (e.g., an LLC versus a corporation) affects the parties' respective rights and duties.

The parties did not discuss termination rights, buy-out provisions, or control/voting rights (if an entity was to own PTech+). (ECF No. 85 at 69).

Tiger Trading's failure to demonstrate the essential terms of the agreement is fatal to its theory of recovery.

18 / 25

c.  **Huffman's Membership in HDD Rotary**

The events surrounding Huffman's membership in HDD Rotary are inconsistent with Tiger Trading's assertions.  Although this does not relate directly to whether Tiger Trading's case-in-chief set forth with sufficient specificity the essential terms of an oral agreement, it does undermine the assertion that Tiger Trading was the unquestioned owner of 30% of PTech+.  An individual with Huffman's business acumen who already owned 30% of PTech+ would not have agreed to this deal.  This indirectly undermines the assertion that the parties had previously reached a final agreement entitling Tiger Trading to a 30% interest in PTech+.

The background to this agreement is that HDD Rotary had 100% of the ownership rights in PTech+ at this point after the assignment by Pacheco,[9] the PTech+ patent had been filed, and HDD Rotary owed Tiger Trading a significant amount of money from unrelated business deals. The approximate time-frame is the latter part of 2009, after the filing of the patent application. (Pl. Ex. 7).

Huffman testified that the terms of the agreement were as follows.  Huffman would become a member of HDD Rotary with a 30% ownership interest.  (ECF No. 85 at 125; Pl. Ex. 7).  Huffman would also receive $200,000.00 of the $500,000.00 owed to him, paid out of loan proceeds.  (Pl. Ex. 7).  In exchange, Huffman would convert the remaining $300,000.00 owed to him to a three-year note and sign as guarantor on several loans.  (ECF No. 85 at 89; Pl. Ex. 7).

At the time this deal was discussed, Huffman knew that HDD Rotary's liabilities exceeded its assets[10]:

> **Wyatt**:  So, do you have any idea of whether or not par value [of HDD Rotary] was a sum or was nominal at that time?

---

[9] Again, although HDD Rotary had the rights to the invention, Huffman maintains that HDD Rotary held those rights as a sort of nominee and that Tiger Trading's ownership rights were never impacted by this.

[10] This is excluding the value of the PTech+ invention.

> **Huffman**: Its par value was, I believe, negative. Well, par value of – also means – I think we're mixing terms. Par value for the shares that are issued based on the original authorization is one thing; the value of the company is another. Which one are you talking about?
>
> **Wyatt**: I'm asking whichever one you meant in this email.
>
> **Huffman**: I knew that there was no par value. It was not a corporation, it was an LLC. And par value was negative, so basically I was going to purchase the stock for nothing because there was no value.

(ECF No. 85 at 126). Huffman reiterated this later while discussing the consideration surrounding the deal:

> The consideration for getting the 30 percent for no capital contribution was because I had been financing HDD 'cause they weren't paying me, which Gary acknowledged that that was only fair because I'd been owed several hundred thousand dollars which at that time was putting me in a difficult position. Agreeing to convert this 300,000 of it into a long-term debt, at that time the two partners only had about $200,000 apiece invested in it anyway and it had a negative net worth. I wasn't interested in putting any money into it, but I was interested in helping them in ways that would make them more financeable.

(ECF No. 85 at 147).

This deal does not make sense—unless Huffman did not already own 30% of PTech+. In this deal Huffman is receiving a 30% interest in a company whose only positive value comes from an invention of which Huffman allegedly already owns 30%. The exchange of ownership interests actually would have left Huffman worse off. A 30% ownership interest in a profitable invention alone is better than a 30% share of a company whose value would be negative but for ownership of the same invention.

This deal arguably wouldn't make sense if it were a simple swap of rights. But Huffman was to pay for the privilege by guaranteeing three new loans and agreeing to convert to a three-year note $300,000.00 of the $500,000.00 HDD Rotary owed him. The only other benefit to

Huffman was payment out of the loan proceeds of $200,000.00 of the $500,000.00 owed to him.[11] This simply doesn't make sense if Huffman already owned 30% of PTech+ outright.

### V.     Tiger Trading Post-trial Brief

#### a.   Motion for Reconsideration

The Court preliminarily granted Ogle's motion for judgment on partial findings.  The Court explicitly stated the reason was an absence of sufficient specificity as to the agreement. (ECF No. 89 at 41).  Even after the close of Tiger Trading's case-in-chief, the Court was unclear of the agreement Tiger Trading was seeking to enforce.  (ECF No. 89 at 35) ("But no, the problem is, [although] so far I don't have any denial of the existence of an agreement. . . . I have – I don't know what the agreement is.").

The Court allowed Tiger Trading the opportunity to submit a brief showing that its case-in-chief did demonstrate the existence of an oral agreement sufficiently specific as to be enforceable.  (ECF No. 89 at 41).  The brief was in essence a motion to reconsider under Rule 9023.

Tiger Trading submitted a post-trial brief.  (ECF No. 93).  In addition to arguing that its case-in-chief demonstrated an enforceable oral agreement, Tiger Trading raised a new theory of recovery—ownership under the "employed to invent" doctrine.  (ECF No. 93 at 2).  Under this theory of recovery, an enforceable oral agreement is not necessary as long as Tiger Trading could successfully demonstrate that it hired Pacheco for the purpose of inventing.  (ECF No. 93 at 2) ("While the Plaintiff maintains that the uncontroverted evidence at day one of the trial does support the elements of a contract, albeit bare bones, even in the absence of such an agreement, the Plaintiff is not without a remedy.  The United States Supreme Court has adopted a remedy

---

[11] Although a $200,000 payment on a $500,000 debt sounds significant, the specifics of the deal make it less so. The $200,000 was to come out of proceeds of a loan that Huffman  guaranteed.

that protects the rights of employers in the technologies it has paid to be invented.")  Under this theory of recovery, Tiger Trading is entitled to 50% of PTech+ as it paid half of Pacheco's salary.  (ECF No. 93 at 2).

Tiger Trading argues that this theory of recovery was properly pled.  In the alternative, Tiger Trading requests leave to amend the pleadings under Rule 7015.

This additional theory of recovery was not properly pled, was not tried by consent, was waived by Tiger Trading, and will not be considered.

### b.  Employed to Invent Doctrine not Pled

Tiger Trading argues that it properly pled the "employed to invent" doctrine.  (ECF No. 93 at 13).  As support, Tiger Trading references various facts listed in the complaint and highlights that the complaint seeks a declaratory judgment for 30% of PTech+ or an equivalent percentage of the proceeds.  (ECF No. 93 at 13).

The Court finds that, on the contrary, the facts referenced by Tiger Trading do not even constitute a vague illusion to the "employed to invent" doctrine.  That the complaint seeks a declaratory judgment for 30% of PTech+ or an equivalent percentage of proceeds actually undercuts this argument because under that theory of recovery Tiger Trading would apparently be entitled to 50% of PTech+.  Furthermore, the parties' Joint Pretrial Statement clearly shows that the "employed to invent" doctrine was not a theory advanced by Tiger Trading.

The parties filed a Standard Joint Pretrial Statement on September 4, 2012. (ECF No. 65). The Standard Joint Pretrial Statement is devoid of references to the "employed to invent" theory of recovery.  Tiger Trading's Contentions were as follows:

> Tiger contends that Tiger, Gary Haub (either individually or by and through one of his companies), and Cain Pacheco (collectively the "Parties") agreed, prior to its inception, to invent and develop the technology that is known today as PTech+.  The Parties further agreed that

the ownership breakdown would be 60% for Haub (or subsequently, HDD), 30% for Tiger, and 10% for Cain Pacheco (the inventor). Tiger further contends that the value of HDD at its time of sale was almost entirely attributable to PTech+, and that Tiger is thus entitled to 30% of the sale proceeds, as they were never part of the Debtor's estate.

(ECF No. 65 at 2).

The Contested Issues of Fact section of the Joint Pretrial Statement lists the following facts in contention: (i) Whether Tiger, Haub (and/or his company), and Pacheco agreed to invest in and develop PTech+ and that Tiger would own 30% of the PTech+ technology prior to the patent application being filed on or around July 14, 2009.; (ii) Whether such oral agreement, if it exists, is sufficiently definite in its terms to be enforceable by the Court.; (iii) Whether Tiger performed its obligations under the contract it alleges substantially so that it is entitled to the benefit of its bargain.; (iv) If Tiger is found to be a 30% owner of PTech+, what amount Tiger owes the estate for its portion of the costs of developing PTech+.  (ECF No. 65 at 2).  Whether Pacheco was employed to invent is not listed.[12]

The Joint Pretrial Statement lists the following as "Agreed Applicable Propositions of Law": (i) 35 U.S.C. § 261 requires all transfers of ownership interests in patents to be in writing after the date an application is filed.; (ii) An agreement to develop and own a technology does not need to be in writing to be valid and binding.; (iii) In order for a court to be able to enforce an oral agreement, the court must find that the oral agreement is sufficiently definite in its terms that a court can understand what the respective promises are.; (iv) If Tiger owned 30% of PTech+ prior to the application for patent being filed, then legal and equitable title vest in Tiger for the patent-pending and subsequent patent for PTech+ upon the application's filing.  (ECF No.

---

[12] Tiger Trading cannot argue that this is because the fact is uncontested.  There was evidence indicating that, although Pacheco later switched to inventing, he was originally hired to do various engineering activities.  The nature of Pacheco's employment would have surely been a contested issue of fact had the "employed to invent" doctrine been before the Court.

65 at 2-3).  There are no contested issues of law listed.  (ECF No. 65 at 3).  There is a complete absence of the "employed to invent" doctrine (as either an agreed proposition or contested proposition of law).

The employed to invent doctrine was not pled.

### c.  Motions for Reconsideration and Leave to Amend Must Be Denied

The Plaintiff may not, after resting its case-in-chief, amend its complaint to bring forth new theories of recovery after realizing the insufficiency of its original theories.

The Fifth Circuit case of *S. Constructors Grp. Inc. v. Dynalectric Co.* is analogous. 2 F.3d 606 (5th Cir. 1993).  In *S. Constructors Grp.*, the plaintiff's original and amended complaints contained causes of action all predicated upon proof of an enforceable contract. 2 F.3d at 608.  After extensive discovery, the parties agreed to submit all causes of action to arbitration.  2 F.3d at 608.  The arbitration panel found that no contract existed.  2 F.3d at 608. Only after this finding by the arbitration panel did the plaintiffs raise quasi-contract theories of recovery.  2 F.3d at 608.  The arbitration panel refused to hear these new issues and the district court granted the defendants' Motion to Confirm the Arbitration Award.  2 F.3d at 608-09.

The district court denied plaintiffs' Rule 59(e) motion to vacate the judgment and Rule 15 motion for leave to amend. 2 F.3d at 609.  The district court found that the plaintiffs waived the quasi-contract claims and that granting the motion would be unfairly prejudicial to the defendants by subjecting them to further litigation after completion of the arbitration proceedings.  2 F.3d at 609.

The Fifth Circuit affirmed.  2 F.3d at 612.  The plaintiffs' failure to mention the quasi-contract theory in the original complaint, any of the amended complaints, or the pretrial orders resulted in a waiver.  2 F.3d at 609-11.  The district court did not abuse its discretion in refusing

to allow the plaintiffs to amend their complaint.  2 F.3d at 612.  In dicta, the Fifth Circuit stated that the liberal Rule 15 standards would not likely apply after entry of a judgment after trial.  2 F.3d at 611 ("While we have held that the Rule 15 standards apply when a party seeks to amend a judgment that has been entered based on the pleadings, we seriously doubt whether these liberal standards would apply to amendment of a judgment after trial . . . .").

Like the plaintiffs in *S. Constructors Grp.*, Tiger Trading focused all its efforts on contract-based theories.  After trial and an unfavorable judgment on partial findings, Tiger Trading now seeks to add a theory of recovery that does not require an enforceable contract.

The Court finds that Tiger Trading has waived this theory of recovery.  Additionally, the Court finds that allowing Tiger Trading to amend their pleadings at this point would be unfairly prejudicial.  To the extent Tiger Trading's brief is a Rule 9023 Motion for Reconsideration and Rule 7015(b) Motion to Amend, those motions are denied.

**Conclusion**

The Court will enter a separate judgment in accordance with this Memorandum Opinion.

SIGNED **February 4, 2013.**

_____

Marvin Isgur

UNITED STATES BANKRUPTCY JUDGE